# 24-2654

## United States Court of Appeals for the Second Circuit

REBECCA DONNER,

*Plaintiff-Appellant,*

v.

DER SPIEGEL GMBH & CO. KG, SPIEGEL-VERLAG
RUDOLF AUGSTEIN GMBH & CO. KG,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

NATHAN A. HOLCOMB, ESQ. PC
*Attorneys for Plaintiff-Appellant*
125 Park Avenue, 25th Floor
New York, New York 10017
(646) 819-0303
nholcomb@holcombpc.com

**3241**



# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF ISSUES .......................................................................1

STATEMENT OF THE CASE ....................................................................2

     A.    *Der Spiegel*'s International Reach ........................................4

     B.    *Der Spiegel*'s Distribution of Its Print Edition Through Its "Known Office of Publication" in Buffalo. ........................................4

     C.    *Der Spiegel*'s Distribution of Its Online Edition in New York via Its Interactive Website. ........................................6

     D.    *Der Spiegel*'s Defamatory Attack ........................................7

     E.    Proceedings Before the District Court. ...............................9

SUMMARY OF ARGUMENT .................................................................10

STANDARD OF REVIEW ......................................................................12

ARGUMENT ..........................................................................................13

I.    THE DISTRICT COURT HAD PERSONAL JURISDICTION OVER APPELLEES UNDER CPLR § 302(a)(1) ....................................13

     A.    Jurisdiction Lies Under CPLR § 302(a)(1) Because Appellees Engaged in Purposeful Transactions of Business in New York. .........13

     1.    Appellees Engaged in Purposeful Transactions of Business in New York Relating to Their Print Edition. ..............................15

     2.    Appellees Engaged in Purposeful Transactions of Business in New York Relating to Their Online Edition. .........................17

     3.    This Court Should Reject an Interpretation of Its Precedent That Renders All Activities Related to Distribution Irrelevant to Personal Jurisdiction in Defamation Cases ...................................20

i

B.    Jurisdiction Lies Under CPLR § 302(a)(1) Because Appellees Contracted To Supply Goods Within New York. ...............................27

II.    THE DISTRICT COURT HAD PERSONAL JURISDICTION OVER APPELLEES UNDER CPLR § 302(a)(4) ..................................................28

CONCLUSION ........................................................................................29

CERTIFICATE OF COMPLIANCE .......................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AFL–CIO v. A.S. Abell Co.*,
    58 Misc.2d 483 (Sup. Ct. N.Y. Cnty. 1968) ................................................. 23, 25

*American Girl, LLC v. Zembrka*,
    118 F.4th 271 (2d Cir. 2024) ....................................................................... 18, 19

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ...................................................................... passim

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) ...................................................................19

*CutCo Indus. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986) ...................................................................24

*Donner v. DER SPIEGEL Gmbh & Co. KG*,
    747 F. Supp. 3d 681 (S.D.N.Y. 2024) ...................................................................2

*Fischberg v. Doucet*,
    9 N.Y.3d 375 (2007) ...........................................................................14

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003) ...................................................................13

*Kernan v. Kurz–Hastings, Inc.*,
    175 F.3d 236 (2d Cir. 1999) ...................................................................12

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988) ..................................................................... 16, 28

*Legros v. Irving*,
    38 A.D.2d 53 (1st Dep't 1971) ................................................................. 14, 24

*Matchroom Boxing Ltd. v. Paul*,
    No. 22-cv-817, 2024 WL 4363700 (S.D.N.Y. Sept. 30, 2024) .................... 24, 25

*Mizrahi v. Gonzales*,
    492 F.3d 156 (2d Cir. 2007) ...................................................................... 12, 27

*Montgomery v. Minarcin*,
    263 A.D.2d 665 (3d Dep't 1999)...................................................... 14, 23, 24, 26

*Robinson v. Overseas Military Sales Corp.*,
    21 F.3d 502 (2d Cir. 1994) ............................................................13

*Sovik v. Healing Network*,
    244 A.D.2d 985 (4th Dep't 1997), *amended on reargument*, 679 N.Y.S.2d 858
    (App. Div. 1998) ........................................................................ 23, 25

*SPCA of Upstate New York, Inc. v. Am. Working Collie Ass'n*,
    18 N.Y.3d 400 (2012) ..................................................... 10, 13, 14, 17

*Tannerite Sports, LLC v. NBCUniversal Media LLC*,
    135 F. Supp. 3d 219 (S.D.N.Y. 2015), *aff'd sub nom. Tannerite Sports, LLC v.
    NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d
    236 (2d Cir. 2017)........................................................................16

*Trachtenberg v. Failedmessiah.com*,
    43 F. Supp. 3d 198 (E.D.N.Y. 2014) ................................................24

**Statutes**

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1332 ..........................................................................1

CPLR § 302(a)(1) ................................................................. passim

CPLR § 302(a)(2) ................................................................. 13, 20

CPLR § 302(a)(3) ................................................................. 13, 20

CPLR § 302(a)(4)............................................................ 2, 12, 28, 29

**Rules**

Fed. R. App. P. 4(a)(1)...................................................................1

Fed. R. Civ. P. 12(b)(2)..................................................................9

Fed. R. Civ. P. 12(b)(3)..................................................................9

## JURISDICTIONAL STATEMENT

This appeal is from a September 5, 2024 final judgment of the U.S. District Court for the Southern District of New York that disposed of all claims in their entirety. This Court has jurisdiction under 28 U.S.C. § 1291. The District Court had subject matter jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship. Plaintiff-Appellant's notice of appeal was timely filed on October 4, 2024, within 30 days of the judgment. Fed. R. App. P. 4(a)(1).

## STATEMENT OF ISSUES

1) Did the District Court err in holding that it lacked personal jurisdiction under New York Civil Practice Law and Rules ("CPLR") § 302(a)(1) notwithstanding Appellees' use, pursuant to U.S. Postal Service regulations, of a "Known Office of Publication" located in New York to distribute print magazines containing defamatory content both within New York and nationwide?

2) Did the District Court err in holding that it lacked personal jurisdiction under CPLR § 302(a)(1) notwithstanding Appellees' use of an interactive website to provide defamatory content to customers in New York who had selected the United States as the country from which they planned to access

1

the Appellees' online content and were then prompted to provide PayPal or Visa payment information?

3) Did the District Court err in holding that it lacked personal jurisdiction under CPLR § 302(a)(4) notwithstanding Appellees' use of property in New York as their "Known Office of Publication" to distribute print magazines containing defamatory content both within New York and nationwide?

## STATEMENT OF THE CASE

This is a defamation action. The District Court (Koeltl, J.) dismissed the action pursuant to Fed. R. Civ. P. 12(b)(2) after concluding that it lacked personal jurisdiction over the Defendants. The District Court's decision is reported at *Donner v. DER SPIEGEL Gmbh & Co. KG*, 747 F. Supp. 3d 681 (S.D.N.Y. 2024).

Plaintiff-Appellant Rebecca Donner is the prizewinning American author of *All the Frequent Troubles of Our Days: The True Story of the American Woman at the Heart of the German Resistance to Hitler*. The book is a biography of her great-great-aunt Mildred Harnack, an American graduate student from Wisconsin who moved to Germany and contributed to the resistance against Hitler. Titled after the first line of a Goethe poem that Mildred translated in a Berlin prison before she was guillotined on Hitler's direct order, the book was translated into multiple language and sold worldwide.

2

Defendants-Appellees DER SPIEGEL Gmbh & Co. KG and SPIEGEL-Verlag Rudolf Augstein Gmbh & Co. KG ("Appellees") publish the German news magazine *Der Spiegel* in both print and online editions and distribute it across the globe. Outside of their litigation filings, Appellees are not shy about their international aspirations and reach. They herald that "you can read DER SPIEGEL content both on our website and in print, by subscription as well as at German newsstands and major international newsstands around the world." They advertise their dedicated United States sales contact and tout the facility in Buffalo, New York, that they use to distribute their print magazines throughout the United States.

This case arises from Appellees' deployment of their international influence to damage Donner's reputation globally and compromise her ability to market her books worldwide. Jurisdiction lies in New York because Appellees contracted to distribute print magazines in New York; distributed those magazines within New York; used a New York facility to distribute print magazines throughout the United States; and transacted with German-speaking New York residents by means of their interactive website to provide them with paid online media content.

3

Donner justifiably brought this case in New York, where she is a citizen, where she has enduring personal and business ties, and where she has counsel prepared to represent her through trial.

### A. *Der Spiegel*'s International Reach.

As alleged in Donner's Amended Complaint, Appellees tout their international aspirations and reach, heralding: "A selection of DER SPIEGEL articles is available in English translation online each week. Furthermore, you can read DER SPIEGEL content both on our website and in print, by subscription as well as at German newsstands and major international newsstands around the world." (JA–15, ¶ 21.)

There is a significant international market for Appellees' German-language content, including in the United States. (JA–15–16, ¶¶ 22–23.) On a page of its website directed at German-speaking readers outside of Germany, the United States is listed as one of 14 countries with a dedicated sales contact. (JA–15, ¶ 22.)

### B. *Der Spiegel*'s Distribution of Its Print Edition Through Its "Known Office of Publication" in Buffalo.

Appellees distribute their German-language magazines throughout the United States, including in the Southern District of New York, using their "Known Office of Publication" in Buffalo, New York. (JA–16, ¶ 25.) Under USPS regulations, a "Known Office of Publication" allows a publisher to

distribute print publications at the "media mail" rate. (JA–16–17, ¶ 26.) *Der Spiegel*'s German-language print edition is also sold at international newsstands in New York City. (JA–17, ¶ 28; JA–48, ¶ 16.)

Appellees' representative Torben Sieb states that *Der Spiegel*'s use of its "Known Office of Publication" is pursuant to a contract with a service provider called IPS Pressevertrieb, which in turn "partners with a company called Data Media Inc., located in Buffalo, New York." (JA–46, ¶¶ 8–9.) Sieb emphasizes that "Defendants have no contractual relationship with Data Media Inc." (*Id.*) But USPS records list *Der Spiegel*'s address in Hamburg as the address of the "publisher." (JA–14, ¶ 19; JA–209–214.) Under USPS regulations, it is the "publisher"—i.e. *Der Spiegel*—that is required to maintain a "Known Office of Publication" to take advantage of media rates. (JA–129, § 4.5.1.) In the case of foreign publications, "[t]he known office of publication may be the office of the publisher's agent." (JA–143, § 6.6.2.) Accordingly, if Data Media is maintaining *Der Spiegel*'s "Known Office of Publication" consistent with USPS regulations, then it is acting as Appellees' "agent."

Sieb states that *Der Spiegel* has approximately 70 print subscribers in New York, 60 Managed by Data Media Inc. and 10 managed by *Der Spiegel* directly. (JA–47, ¶¶ 13–14.) Appellees have not disclosed, however, how many print subscribers elsewhere in the United States receive magazines mailed through their

"Known Office of Publication" in New York.

### C. *Der Spiegel*'s Distribution of Its Online Edition in New York via Its Interactive Website.

Online access to the article at issue in this case (the "Article") was limited to subscribers who had purchased the "SPIEGEL+" service. (JA–18, ¶ 30; JA–48, ¶¶ 18–19; JA–51–52.)

*Der Spiegel* markets SPIEGEL+ through an interactive website to users around the world, including in the United States. (JA–17, ¶ 29.) German-speaking subscribers are invited select a "Nutzungsland" (i.e., the country from which they will be using the online subscription) from dozens of options, including the "Vereinigte Staaten" (i.e. the United States). (*Id.*) Only after selecting the United States is the subscriber then invited to enter PayPal or Visa payment details to obtain access. (*Id.*) The fact that the user is invited to select the United States in its German translation ("Vereinigte Staaten") is significant because the only readers who would appropriately make this selection are German-speaking readers in the United States.

Sieb states that "Defendants do not have reliable information regarding the location of the digital subscribers or the subscribers to SPIEGEL+," but acknowledges that there are approximately 3,000 monthly page views from New York and that there have been "112 page views and 68 page visits of the Article

from New York." (JA–48–49, ¶¶ 20–21.)

**D.** *Der Spiegel*'s **Defamatory Attack.**

Donner drew from international experts and sources and conducted extensive research at twenty-five archives in the United States, Germany, England, and Russia in order to assemble the facts for her biography. (JA–8, ¶ 2.) Following the book's success in the English-speaking world, publishers abroad expressed interest in foreign-language editions. (JA–8–9, ¶ 3.) On September 15, 2022, one year after the book had been published in the United States, Kanon Verlag published the first foreign-language edition in Germany. (*Id.*)

Arizona-based journalist Jasmin Loerchner had first contacted Donner on behalf of *Der Spiegel* months earlier under the pretense that the magazine was planning to publish the first "profile" of Donner in Germany. (JA–22, ¶ 41.) Loerchner is advertised as a *Der Spiegel* journalist on its website, which links to 106 articles authored or co-authored by Loerchner between 2015 and 2023. (JA–22, ¶ 42.)

Loerchner told Donner that she was a "journalist working for Der Spiegel" and that "[w]e were thinking about a sort of profile about how you explored and followed your relatives' story, how you saw her in the beginning vs how you see her now and also how her story of resistance reverberates in recent U.S. culture and politics." (JA–22–23, ¶ 43.) Loerchner first proposed meeting in New York,

but after learning that Donner was in California at the time and had plans for a Berlin trip, Loerchner suggested that Donner should meet with one of her "German coworkers." (JA–22–23, ¶¶ 43–44; JA–55, ¶ 11.)

Emphasizing that "this would be a bigger undertaking than a book review," Loerchner said that "we'd love to make sure we're the first German publication to publish a profile of you on the subject," and asked Donner if she would agree to these terms. (JA–23–24, ¶ 44.) Donner agreed. (JA–24, ¶ 45.) *Der Spiegel*'s insistence on Donner's agreement that it would be the first German publication to publish a profile of her ensured that the article it would ultimately publish would have a maximally devasting impact on her reputation. (*Id.*) Loerchner then introduced Donner to another *Der Spiegel* journalist, Martin Pfaffenzeller, who met Donner in Berlin for approximately four hours. (JA–24–25, ¶ 46; JA–55, ¶ 11; JA–60–61, ¶¶ 9, 15.)

Loerchner and Pfaffenzeller co-authored *Der Spiegel*'s article. (JA–25, ¶ 47; JA–55, ¶¶ 12–13.) Titled "Pure Fantasy" in the print edition and "How Much Poetry Is There in a Historical Nonfiction Book?" in the online edition, the article advances the most serious accusations that can be made against a biographer: that "apparently the story was more important to her than faithfulness to the facts" and that "the author apparently wasn't always exacting with the facts." (JA–25, ¶ 47.)

*Der Spiegel* has since pivoted from its prior characterizations and admitted

8

that Donner did not make misrepresentations. It now claims that the Article was merely a "book review" that "never accuses Ms. Donner of lying or intentionally misrepresenting facts," but instead offers the "opinions" that "Ms. Donner's book occasionally presented facts in a misleading manner or was not very clear when certain anecdotes were fabricated" and "simply points out that she failed to provide appropriate context for some of her assertions, which could cause a reasonable reader to draw false conclusions." (JA–10, ¶ 7; JA–37, ¶ 81.) But that is not what the Article says. (JA–10, ¶ 8; JA–37–38, ¶ 82.)

Appellees' attack on Donner has damaged her international reputation as a biographer and her livelihood. (JA–39, ¶ 85.) In particular, Appellees have harmed Donner's ability to negotiate contracts for foreign-language editions of both her current and forthcoming books. (*Id.*) The harm is disconnected from Germany because it relates to foreign-language editions outside Germany. Donner's German publisher has firmly stood by her. (*Id.*)

### E. Proceedings Before the District Court.

Donner filed suit against Appellees, both affiliates of *Der Spiegel*, in the U.S. District Court for the Southern District of New York. Her operative pleading is her Amended Complaint. (JA–8–42.) Appellees moved to dismiss under Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(3), contending that the District Court lacked personal jurisdiction and that venue was improper. (JA–43–44.) In the

9

alternative, Appellees moved to dismiss on the basis of *forum non conveniens*. Donner opposed the motion to dismiss and, in the alternative to her opposition, cross-moved for a transfer of venue to the District of Arizona (where Loerchner was located when she contacted Donner) or the District of California (where Donner was residing when Loerchner contacted her and when Article was published). (JA–57–58.)

The District Court granted Appellees' motion to dismiss and denied Donner's cross-motion for transfer of venue. (JA–290–319.)

## SUMMARY OF ARGUMENT

Donner has made a *prima facie* case that Appellees are subject to personal jurisdiction in New York under CPLR § 302(a)(1) by alleging that "purposeful transactions of business have taken place in New York." *SPCA of Upstate New York, Inc. v. Am. Working Collie Ass'n*, 18 N.Y.3d 400, 404 (2012). With regard to *Der Spiegel*'s print edition, Donner alleges that "purposeful transactions have taken place in New York" because Appellees use a "Known Office of Publication" in Buffalo, New York to distribute print magazines throughout the United States. With respect to online distribution, Donner alleges that "purposeful transactions of business have taken place in New York" because Appellees use an interactive website to sell their online SPIEGEL+ service to subscribers in New York. These allegations satisfy the Second Circuit's requirement to show

10

"something more" than "mere defamatory utterances sent into the state." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 248, 249 (2d Cir. 2007).

The District Court's reasoning to the contrary relied on a misinterpretation of the Second Circuit's precedent in *Best Van Lines*. That precedent did not lay down a *per se* rule that business activities related to distribution of defamatory content are excluded in their entirety from the analysis of personal jurisdiction under CPLR § 302(a)(1). Nor did it make the research, drafting, or editing of defamatory content in New York the *sine qua non* for personal jurisdiction over a defamation defendant in New York. *Best Van Lines* instead acknowledged that a defamation defendant's transactions of business in New York can support personal jurisdiction while holding that on the facts presented, the mere posting of online content from Iowa without a paywall did not encompass the requisite transaction of business. Here, in contrast, Donner alleges transactions of business in New York that give rise to her claims.

The fact that Appellees contracted with IPS, which in turn partners with Data Media, Inc., to distribute print magazines through a "Known Office of Publication" in New York provides an independent and sufficient ground for jurisdiction. CPLR § 302(a)(1) provides for jurisdiction over "any non-domiciliary [. . .] who in person or through an agent [. . .] transacts any business within the state *or* contracts anywhere to supply goods or services in the state."

11

(Emphasis added.) The District Court's failure to address this independent ground for jurisdiction violated the "standard canon of statutory construction that words separated by the disjunctive are intended to convey different meanings unless the context indicates otherwise." *Mizrahi v. Gonzales*, 492 F.3d 156, 164 (2d Cir. 2007).

Finally, CPLR § 302(a)(4) provides an additional independent and sufficient ground for long-arm jurisdiction because Appellees used their "Known Office of Publication" in New York to distribute copies of the magazine containing the defamatory Article. The District Court's rejection of CPLR § 302(a)(4) as a basis for jurisdiction relied again on its erroneous interpretation of *Best Van Lines* as laying down a *per se* rule that business activities in New York related to the distribution of defamatory material have categorical immunity from the exercise of long-arm jurisdiction, and that only in-state research, drafting, or editing of defamatory content can suffice.

## STANDARD OF REVIEW

This Court "review[s] a district court's dismissal of an action for lack of personal jurisdiction de novo." *Best Van Lines, Inc.*, 490 F.3d at 242.

"On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999) (quotation omitted). To

12

survive a motion to dismiss where, as here, no evidentiary hearing is held, the plaintiff need only make a *prima facie* case that the defendant is subject to the court's personal jurisdiction. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction.").

"In determining whether a plaintiff has met this burden, [the Court] will not draw argumentative inferences in the plaintiff's favor" but will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (cleaned up).

## ARGUMENT

### I. THE DISTRICT COURT HAD PERSONAL JURISDICTION OVER APPELLEES UNDER CPLR § 302(a)(1)

#### A. Jurisdiction Lies Under CPLR § 302(a)(1) Because Appellees Engaged in Purposeful Transactions of Business in New York.

"Although defamation claims . . . cannot form the basis for 'tortious act' jurisdiction [pursuant to CPLR § 302(a)(2) & CPLR § 302(a)(3)], such claims may proceed against non-domiciliaries who transact business within the state and thereby satisfy the requirements of CPLR 302 (a)(1)." *SPCA of Upstate New York, Inc.*, 18 N.Y.3d at 403–04 (2012). "Defamation claims are accorded separate treatment to reflect the state's policy of preventing disproportionate restrictions

on freedom of expression—though, *where purposeful transactions of business have taken place in New York, it may not be said that subjecting the defendant to this State's jurisdiction is an unnecessary inhibition on freedom of speech or the press*." *Id.* (cleaned up and emphasis added; quoting *Legros v. Irving*, 38 A.D.2d 53, 55–56 (1st Dep't 1971)). "Although it is impossible to precisely fix those acts that constitute a transaction of business," the precedents of the New York Court of Appeals "establish that it is the quality of the defendants' New York contacts that is the primary consideration." *Fischberg v. Doucet*, 9 N.Y.3d 375, 380 (2007).

Consistent with the guidance of the New York Court of Appeals, Donner's allegations satisfy the requirement to show that "purposeful transactions of business have taken place in New York." *SPCA of Upstate New York*, 18 N.Y.3d at 404. In so doing, they satisfy this Court's requirement to show "something more" than "mere defamatory utterances sent into the state." *Best Van Lines, Inc.*, 490 F.3d at 248, 249; *see also Montgomery v. Minarcin*, 263 A.D.2d 665, 668 (3d Dep't 1999) (cleaned up) ("Viewing the totality of [defendant's] activities in this State, we conclude that plaintiff's allegations are sufficient and supported by record evidence demonstrating that [defendant] engaged in purposeful activity in this State which is directly related to and forms the basis of plaintiff's causes of action so as to be deemed to have transacted business in this State within the intendment of CPLR 302(a)(1)." (citations omitted)).

14

### 1.  Appellees Engaged in Purposeful Transactions of Business in New York Relating to Their Print Edition.

With regard to *Der Spiegel*'s print edition, Donner alleges that "purposeful transactions have taken place in New York" because Appellees use a "Known Office of Publication" in Buffalo, New York to distribute print magazines throughout the United States. (JA–16–17, ¶¶ 25–26.)

Appellees have attempted to distance themselves from their own "Known Office of Publication." Pointing out that they use IPS as an intermediary and that IPS in turn partners with Data Media Inc., Appellees protest that they have "no contractual relationship with Data Media Inc." (JA–46, ¶ 9.) They admit, however, that they "contract with [IPS], which buys copies of Der Spiegel in Germany and then sells them to international partners." (JA–46, ¶ 8.) And they admit that IPS partners with Data Media "to market and manage subscriptions within the United States." (JA–46, ¶ 9.) USPS records related to Appellees' "Known Office of Publication" list *Der Spiegel*'s own address at "Ericusspitze 1, 20457 Hamburg Germany" as the address of the "publisher." (JA–14, ¶ 19; JA–209–214.) If Data Media maintains Appellees' "Known Office of Publication" consistent with USPS regulations, then it is acting as their "agent." (JA–129, § 4.5.1; JA–143, § 6.6.2.)

CPLR § 302(a)(1) provides for jurisdiction over a non-domiciliary who "*through an agent* . . . transacts any business within the state." (Emphases added.) No "formal agency relationship" is required. *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). Donner "need only convince the court that [Data Media] engaged in purposeful activities in this State in relation to its transaction for the benefit of and with the knowledge and consent of the [Appellees] and that they exercised some control over [Data Media] in the matter." *Id.* This much is evident from the fact that Appellees advertise their "Known Office of Publication" on their own website. (JA–16, ¶ 25.) Regardless of whether or not there is a contract governing the relationship between Appellees and Data Media, Appellees cannot credibly advertise a New York facility on their own website and at the same time claim that magazines distributed through that same facility have "reached the forum fortuitously." *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 230 (S.D.N.Y. 2015), *aff'd sub nom. Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236 (2d Cir. 2017).

The argument Appellees advanced to the District Court that the fact the Article was in German means any New York readership must have been merely "fortuitous" is no more persuasive. As Donner alleges, there is a substantial German-speaking population in the United States and a significant overlap

16

between people with knowledge of German and an interest in German history, who are particularly important to Donner's professional reputation. (JA–16, ¶¶ 23–24.) The fact that Appellees intend German-speaking readers in the United States to read their content is evident from the fact that their own website invites users to select the United States as their country of use with the German name for "United States"—"Vereinigte Staaten." (JA–17–18, ¶ 29.)

Significantly, Appellees' Buffalo facility serves as their "Known Office of Publication" for the entire United States. (JA–16, ¶ 25.) New York is not just one state among others on the receiving end of *Der Spiegel*'s print distribution; it is the State Appellees use to send print magazines to every U.S. State in which they have print subscribers.

### 2. Appellees Engaged in Purposeful Transactions of Business in New York Relating to Their Online Edition.

With respect to online distribution, Donner alleges that "purposeful transactions of business have taken place in New York" because Appellees use an interactive website to sell their online SPIEGEL+ service to subscribers in New York. *SPCA of Upstate New York, Inc.*, 18 N.Y.3d at 404. The Second Circuit recognized in *Best Van Lines* that "a website's interactivity may be useful for analyzing personal jurisdiction under section 302(a)(1) . . . insofar as it helps to decide whether the defendant 'transacts any business' in New York[.]" 490 F.3d

at 252 (cleaned up). No jurisdiction lay in that case because the plaintiff's claims arose "solely from the aspect of the website from which anyone—in New York or throughout the world—could view and download the allegedly defamatory article." *Id.* at 253 (quotation omitted).

Here, in contrast, *Der Spiegel*'s website is interactive in a manner directly related to Donner's defamation claim because use of the website's interactive features to consummate a business transaction and subscribe to SPIEGEL+ was a prerequisite for a New York subscriber to have access to the Article's defamatory content. Only after selecting the United States as the country of use is were subscribers invited to enter PayPal or Visa payment details. (JA–17–18, ¶ 29.) Appellees have emphasized that the online version of article at issue in this case was behind a paywall, with access limited to subscribers who had purchased a SPIEGEL+ online subscription, as if this were helpful to their argument. But this is the very fact that distinguishes this case from the website in *Best Van Lines* and dictates a contrary result.

This Court's precedent in *American Girl, LLC v. Zembrka*, 118 F.4th 271 (2d Cir. 2024)—issued after the District Court's judgment on appeal—supports Donner's position. In that case, Plaintiff-Appellant American Girl alleged that Defendant-Appellee Zembrka, which was located in the People's Republic of China, violated its trademark rights by selling dolls that were confusingly similar

to American Girl dolls. *Id.* at 273. In support of personal jurisdiction, American Girl alleged that Zembrka "maintained interactive websites through which customers, including those located in New York, could place orders by inputting their billing and payment information, shipping address, and contact information, and that customers were then sent confirmations of their orders." *Id.* at 275. The district court dismissed the action, holding that because Zembkra had canceled orders and there was no evidence it had actually shipped goods into New York, no business was transacted in New York under CPLR § 302(a)(1). *Id.* at 278. Citing *Best Van Lines*, the Second Circuit reversed the district court, explaining that "Section 302(a)(1) does not require a shipment. It requires a transaction." *Id.*

American Girl had satisfied the requirement of "a transaction" with "evidence that a prospective customer in New York could submit an order and payment information through Zembrka's website that, in turn triggered an order confirmation email from Defendants and payment receipts from PayPal." *Id.* Accordingly, the Second Circuit held that the district court had "erred in characterizing Defendants' websites as merely 'accessible' from New York." *Id.*; *see also Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (exercising jurisdiction on the ground that the defendant had operated "a highly interactive website offering [counterfeit handbags] for sale to New York consumers" and "engaged in fifty-two other transactions where merchandise was

19

shipped to New York"). Likewise here, Donner has alleged more than that Appellees' website was "accessible" from New York: She has alleged that prospective subscribers to the online SPIEGEL+ service, after selecting the United States as the country from which they will be using the online subscription, are "invited to enter payment details for PayPal or Visa in order to obtain access to SPIEGEL+." (JA–17, ¶ 29.)

**3.  This Court Should Reject an Interpretation of Its Precedent That Renders All Activities Related to Distribution Irrelevant to Personal Jurisdiction in Defamation Cases.**

The District Court's reasoning was premised on a misinterpretation of this Court's opinion in *Best Van Lines.* According to the District Court, *Best Van Lines* stands for the proposition that activity related to distribution of defamatory material is excluded in its entirety from the jurisdictional analysis under CPLR § 302(a)(1). Instead, according to the District Court, the research, drafting, or editing of defamatory content in New York is the *sine qua non* for New York jurisdiction:

> The distribution of the article is the substance of the defamation and CPLR § 302, with its defamation exceptions in §§ 302(a)(2) and (3), is drafted to preclude personal jurisdiction over the mere distribution of defamatory material in New York. Instead, there must be some connection to the actual writing or editing of the article which underlies the allegation, not simply an allegation that the article was distributed. [. . .] The alleged facts show mere distribution, and

20

> the mere distribution of alleged defamation is insufficient to establish that personal jurisdiction is proper in this case.

(JA–307–308.)

If this interpretation were right, it would mean that there would be no limit to the business activities a defendant could undertake in New York related to distribution of defamatory content while avoiding New York jurisdiction. A professionally orchestrated smear campaign could be planned, paid for, and executed in New York and could target an audience of New Yorkers with impunity—so long as the *content* of the smear were created outside New York. The facts presented in *Best Van Lines* did not call for the Second Circuit to endorse such a sweeping rule; nor should it do so now.

In *Best Van Lines*, the defendant had made an online posting of allegedly defamatory content from his home in Iowa that could be viewed anywhere. 490 F.3d at 241. Unlike the content at issue here, the content was not behind a paywall that made a business transaction with a subscriber a prerequisite for access. On these facts, the Second Circuit held that merely posting allegedly defamatory statements "on a website accessible to readers in New York" did not support jurisdiction. *Id.* at 253. The Court further held that the fact the post was in response to a user's question was irrelevant and that the interactive features of the defendant's website that allowed the defendant to accept donations were unrelated

21

to the allegedly defamatory conduct. *Id.* at 254. The Second Circuit's holding that the mere posting of online content that can be viewed in New York does not establish jurisdiction in New York does not imply that business activities related to distribution of defamatory content can never support long-arm jurisdiction in New York.

Nor does the Second Circuit's explanation of the legal principles it was applying support this extreme result. The Court explained that "the 'single act' of uttering a defamation, no matter how loudly, is not a transaction of business that that may provide the foundation for personal jurisdiction," or in other words, "when the defamatory publication itself constitutes the alleged transaction of business for the purpose of section 302(a)(1), more than the distribution of a libelous statement must be made within the state to establish long-arm jurisdiction over the person distributing it." *Best Van Lines*, 490 F.3d at 248. But the Court then cautioned against an overly broad interpretation of those pronouncements: "To be sure, New York courts have found jurisdiction in cases where the defendants' out-of-state conduct involved defamatory statements projected into New York and targeting New Yorkers, but only where the conduct also included something more." *Id.* at 249.

The Second Circuit did not hold that the "something more" that is required to support jurisdiction must be unrelated to distribution of defamatory material.

Instead, the Court acknowledged the relevance of acts relating to distribution and circulation in New York to a jurisdictional analysis when, in analogizing to *American Radio Association, AFL–CIO v. A.S. Abell Co.*, 58 Misc.2d 483 (Sup. Ct. N.Y. Cnty. 1968), it highlighted the fact that in that case "[t]he acts of publication, *of distribution and of circulation* which underlie the alleged grievances occurred in Baltimore and not here." *Best Van Lines*, 490 F.3d at 250 (quoting *AFL–CIO*, 58 Misc.2d at 485; emphasis added). Similarly, the Court highlighted that in *Sovik v. Healing Network*, 244 A.D.2d 985 (4th Dep't 1997), *amended on reargument*, 679 N.Y.S.2d 858 (App. Div. 1998), the court relied on facts including the defendants' "*distribution* of the allegedly defamatory statement" in New York to find long-arm jurisdiction. *Best Van Lines*, 490 F.3d at 249 (quoting *Sovik*; emphasis added). Other New York precedent is in accord: In *Montgomery*, the Appellate Division considered the fact that "[t]he television news reports were *broadcast by [defendant] in this State*" in concluding that the "totality of [the defendant's] activities in this State" supported jurisdiction. 263 A.D.2d at 667 (emphasis added).

*Best Van Lines* allowed for the possibility that distribution of defamatory material through an interactive website could support jurisdiction in New York when the Court explained:

> We think that a website's interactivity may be useful for analyzing personal jurisdiction under section 302(a)(1), but only insofar as it helps to decide whether the defendant "transacts any business" in New York—that is, whether the defendant, through the website, "purposefully avail[ed] himself of the privilege of conducting activities within New York, thus invoking the benefits and protections and its laws."

490 F.3d at 252 (quoting *CutCo Indus. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)). This reasoning is inconsistent with the "in-state research requirement" that district court decisions such as *Trachtenberg v. Failedmessiah.com*, 43 F. Supp. 3d 198 (E.D.N.Y. 2014), have inferred. *Id.* at 202. Neither *Montgomery* nor *Legros*, which the *Trachtenberg* court cited in support, endorses such a rigid rule.

The recent district court decision in *Matchroom Boxing Ltd. v. Paul*, No. 22-cv-817, 2024 WL 4363700 (S.D.N.Y. Sept. 30, 2024)—issued after the District Court's order in this case—illustrates why an "in-state research requirement" is a misguided *per se* rule. The plaintiffs in *Matchroom Boxing Ltd.* were a boxing promotion company and its chairman, both based in the United Kingdom. *Id.* at *1. The defendant was a boxer who resided in Puerto Rico. *Id.* The plaintiffs' defamation claims arose from statements the defendant made in Puerto Rico during an online interview in which he accused the defendants of bribing a judge at a boxing fight in New York. *Id.* at *2. The district court held that it had personal jurisdiction over the defendant, despite the fact that he made the allegedly defamatory statements in Puerto Rico, because the defendant had

agreed to promote the fight at issue and had traveled to New York for that promotion. *Id.* *8. Because the statements were oral, they were never drafted or edited; they were simply uttered in Puerto Rico. The district court's order is silent on whether the defendant conducted any "research" in New York, which is hardly surprising: a false statement made *without* prior research or investigation is just as likely to give rise to a defamation claim as a statement made after research or investigation, if not more so. In *Matchroom Boxing Ltd.*, rather than applying any *per se* rule narrowing the type of transactions of business that may support personal jurisdiction in New York in a defamation case, the district court appropriately conducted the two-step inquiry indicated by the text of CPLR § 302(a)(1): first, whether the defendant transacted business in New York, and second, whether the defamation claims arose from the defendant's conduct. *Id.* at *8. This same two-step inquiry supports jurisdiction in this case.

In sum, the weight of the best-reasoned authority, including this Court's controlling guidance, supports the proposition that business activities relating to distribution and circulation of defamatory material in New York ground jurisdiction. *E.g. Best Van Lines*, 490 F.3d at 250 (quoting *AFL–CIO*, 58 Misc.2d at 25) ("the acts of publication, *of distribution and of circulation* which underlie the alleged grievances occurred in Baltimore and not here" (emphasis added; cleaned up); *Sovik*, 244 A.D.2d at 987 (allowing that "solicitation of funds by

dissemination" of an allegedly defamatory letter could "constitute[] the transaction of business under CPLR 302(a)(1)" and citing the facts that defendants "either *distributed or authorized the distribution of the letter* in the Buffalo area" in support of jurisdiction (emphasis added)); *Montgomery*, 263 A.D.2d at 667 (citing the fact that "[t]he television news reports were *broadcast by [defendant] in this State,* while employed by a local television station owned and operated by defendants" in support of jurisdiction (emphasis added)).

With respect to *Der Spiegel*'s print edition, the business transactions supporting jurisdiction are Appellees' use of a New York facility as their hub for distribution of defamatory material not only within New York, but nationwide. With respect to the *Der Spiegel*'s online edition, the business transactions supporting jurisdiction are Appellees' use of an interactive website to sell defamatory material to subscribers who have first selected the United States as the country from which they will use the SPIEGEL+ service and then, upon being prompted, provided either PayPal or Visa payment details. In both cases, these business transactions in New York provide the required "something more" beyond merely uttering a defamatory statement in New York or sending it into the state.

### B. Jurisdiction Lies Under CPLR § 302(a)(1) Because Appellees Contracted To Supply Goods Within New York.

As noted above, Appellees admit that they "contract with [IPS], which buys copies of Der Spiegel in Germany and then sells them to international partners," as well as that IPS partners with Data Media "to market and manage subscriptions within the United States." (JA–46, ¶¶ 8–9.) This arrangement falls under the plain language of CPLR § 302(a)(1): With their contract with IPS, Appellees are "contract[ing] anywhere to supply goods or services in the state."

The fact that Appellees "contract[ed] anywhere to supply goods or services in the state" provides a sufficient and independent ground for jurisdiction, because CPLR § 302(a)(1) provides for jurisdiction over "any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state *or* contracts anywhere to supply goods or services in the state." (Emphasis added.) "It is a standard canon of statutory construction that words separated by the disjunctive are intended to convey different meanings unless the context indicates otherwise." *Mizrahi*, 492 F.3d at 164. "The canon usefully serves to avoid interpretations that render statutory terms superfluous." *Id.* The District Court violated this canon when it reasoned from the text of the CPLR that "under New York law, to assert long-arm jurisdiction under CPLR § 302(a)(1), the non-domiciliary defendant *must* 'transact business' within the state . . . ." (JA–301 (emphasis added).) This

27

interpretation of the statute renders the statutory language "*or* contracts anywhere to supply goods or services in the state" superfluous. Properly read, that language creates an independent and sufficient criterion for personal jurisdiction. That criterion is satisfied in this case.

## II. THE DISTRICT COURT HAD PERSONAL JURISDICTION OVER APPELLEES UNDER CPLR § 302(a)(4)

CPLR § 302(a)(4) provides an additional independent ground for long-arm jurisdiction because Appellees used their "Known Office of Publication" in New York to distribute copies of the magazine containing the defamatory article. As discussed above, assuming that Data Media is maintaining Appellees' "Known Office of Publication" consistent with USPS regulations, it is acting as their "agent." (JA–129, § 4.5.1; JA–143, § 6.6.2.) Applying the plain language of the statute, jurisdiction lies because Appellees, through their "agent" Data Media, "used" their "Known Office of Publication" in Buffalo to distribute copies of the magazine containing the Article. *See Kreutter*, 71 N.Y.2d at 467.

The District Court rejected jurisdiction under CPLR § 302(a)(4) on the ground that "[t]o find jurisdiction under CPLR § 302(a)(4) for the mere use of property to distribute an allegedly defamatory publication would be inconsistent with the exception for defamation torts under CPLR § 302(a)(4) and the analysis in *Best Van Lines*." (JA–312.) This reasoning again hinges on the District Court's

misinterpretation of *Best Van Lines* as holding that business activities in New York related to the distribution of defamatory material have categorical immunity from the exercise of jurisdiction in New York. On a correct understanding of this Court's reasoning in *Best Van Lines*, the Appellees' use of a physical "Known Office of Publication" in New York as the hub for their distribution of defamatory material nationwide supports jurisdiction under both CPLR § 302(a)(1) and CPLR § 302(a)(4).

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the District Court's judgment and remand for further proceedings.

Dated: March 12, 2025        Respectfully submitted,

*/s/ Nathan A. Holcomb*
NATHAN A. HOLCOMB, ESQ. PC
125 Park Avenue, 25th Floor
New York, New York 10017
nholcomb@holcombpc.com
646.819.0303

*Counsel for Plaintiff-Appellant
Rebecca Donner*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 32.1(a)(4)(A) because, excluding the portions exempted by Fed. R. App. P. 32(f), this brief contains 6,497 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: March 12, 2025                    */s/ Nathan A. Holcomb*

# SPECIAL APPENDIX

i

# TABLE OF CONTENTS

Opinion and Order of Hon. John G. Koeltl,
Dated September 4, 2024
(ECF No. 48) ................................................................. SPA-1

Judgment of United States District Court Southern District of
New York, Dated September 5, 2024, Appealed From
(ECF No. 49) ................................................................. SPA-31

**[SPA-1]**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————————

REBECCA DONNER,

                    Plaintiff,           No. 23-cv-8196 (JGK)

        - against -             <u>OPINION AND ORDER</u>

DER SPIEGEL GMBH & CO. KG, ET AL.,

                 Defendants.

————————————————————————————————

JOHN G. KOELTL, District Judge:

     The plaintiff, Rebecca Donner ("Donner"), brings this action against DER SPIEGEL Gmbh & Co. KG and SPIEGEL-Verlag Rudolf Augstein Gmbh & Co. KG (collectively, "the defendants" or "Der Spiegel") for defamation arising from the defendants' publication of allegedly false and defamatory statements in an article published in the print and digital editions of the German-language magazine, <u>Der Spiegel</u>. <u>See</u> Am. Compl., ECF No. 19 ¶¶ 87-94; ¶¶ 95-103. The plaintiff seeks an injunction requiring the defendants to remove the article from the <u>Der Spiegel</u> website as well as from the paid online SPIEGEL+ service available to subscribers in the United States. The plaintiff also seeks punitive damages and pre- and post-judgment interest.

     The defendants now move to dismiss all claims against them for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), and for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3). In the alternative,

the defendants move to dismiss the case on the basis of forum
non conveniens.

In opposition to the defendants' motion, the plaintiff has
filed a cross-motion to transfer venue to the United States
District Court for the District of Arizona or the United States
District Court for the Central District of California. See Mot.
to Transfer Case in the Alt., ECF No. 27.[1]

## I.

Unless otherwise stated, the following facts are accepted
as true for the purpose of these motions.

## A.

The plaintiff is a citizen of the United States and of the
State of New York. Am. Compl. ¶ 18. The plaintiff is the author
of All the Frequent Troubles of Our Days, a 2021 biography of
the plaintiff's great-great-aunt, Mildred Harnack, who the
plaintiff claims moved to Germany, when Ms. Harnack was an
American graduate student, to join the resistance against
Hitler. Id. ¶¶ 1, 2, 11.

---

[1] On August 5, 2024, the Court heard oral argument on the defendants'
motion to dismiss. Following argument, the Court ordered supplemental
briefing addressing what prejudice, if any, would be caused by the
failure to transfer this case to another District, and how the Court
would determine whether to transfer the case to the District of
Arizona or the Central District of California. See Order, ECF No. 42.
The parties submitted briefing following argument, and this Opinion
and Order addresses those issues.

On September 15, 2022, the German publisher Kanon Verlag published the first foreign language edition of the plaintiff's book, entitled <u>Mildred: The Story of Mildred Harnack and her Passionate Resistance Against Hitler</u>. <u>Id.</u> ¶ 3. The plaintiff's claims arise out of the publication of a German-language article about the plaintiff's book that was published in <u>Der Spiegel</u>'s print edition, <u>see</u> <u>id.</u> ¶¶ 87-94, and on <u>Der Spiegel</u>'s online platform, <u>see</u> <u>id.</u> ¶¶ 95-103.

The plaintiff alleges that Arizona-based journalist Jasmin Loerchner first contacted the plaintiff on behalf of <u>Der Spiegel</u> under the pretense that the magazine was planning to publish the first "profile" of the plaintiff in Germany. <u>Id.</u> ¶ 41. Loerchner initially proposed conducting an interview of the plaintiff in New York, but after the plaintiff clarified that she was living in California and would soon be visiting Berlin, Loerchner introduced the plaintiff to another <u>Der Spiegel</u> reporter in Germany. <u>Id.</u> ¶¶ 43-46. Martin Pfaffenzeller, a <u>Der Spiegel</u> reporter living in Germany, interviewed the plaintiff in Berlin on August 29, 2022. <u>Id.</u> ¶ 46; Donner Decl., ECF No. 29 ¶ 9.

Loerchner and Pfaffenzeller co-authored Der Spiegel's article about the plaintiff's book. Am. Compl. ¶ 47. Loerchner was residing in Arizona when Loerchner worked on the article. Loerchner Decl., ECF No. 24 ¶ 13. Pfaffenzeller, and the other <u>Der Spiegel</u> editors and staff who assisted in drafting or

3

editing the article, were located in Germany when they worked on the article. Id. The print edition and the online version of the article were both published in September 2022. Donner Decl. ¶ 13; Loerchner Decl. ¶ 1; Sieb Decl., ECF No. 23 ¶¶ 1, 18.[2] The print edition of the article was entitled "Pure Fantasy" and the online publication of the article was entitled "How Much Poetry Is There in a Historical Nonfiction Book." Am. Compl. ¶ 47.

The plaintiff alleges that the article accused the plaintiff of "being a fabulist." See id. ¶ 4. Specifically, the plaintiff alleges that the article characterized the plaintiff's book as "false," "pure fantasy," and "speculation," and claimed that the plaintiff admitted to relying on unreliable sources. Id. ¶ 48. The plaintiff contends that she never made any such admission. Id.

Ultimately, Der Spiegel agreed to remove the allegedly false quotation from the online edition of the article but did not publish a correction or retraction in its print edition. Id. ¶ 75. Despite the plaintiff's requests, Der Spiegel refused to remove any other allegedly defamatory statements from the online article. Id.

_____

[2] The Donner Declaration asserts that the online publication of the article appeared on September 15, 2022 and the print edition was published on September 17, 2022. See Donner Decl. ¶ 13. The Loerchner Declaration asserts that the print edition was published on September 16, 2022 and the online edition was published on September 18, 2022. See Loerchner Decl. ¶ 1. The Sieb Declaration also states that the print edition was published on September 16, 2022. See Sieb Decl. ¶ 1.

On September 18, 2023, Donner filed a complaint against the defendants in this Court. Compl., ECF No. 4. Thereafter, on January 5, 2024, Donner filed an amended complaint. In the amended complaint, the plaintiff alleged two causes of action against the defendants, namely: (1) a claim for defamation against SPIEGEL-Verlag Rudolf Augstein Gmbh & Co. KG for printing allegedly false statements in the print edition of the article, see Am. Compl. ¶¶ 87-94; and (2) a claim for defamation against DER SPIEGEL Gmbh & Co. KG for printing allegedly false statements in the online edition of the article, see id. ¶¶ 95-103. The plaintiff claimed that the defendants willfully, and at a minimum recklessly, harmed her reputation and livelihood. Id. ¶¶ 90, 98. The plaintiff asserted that because foreign publishers are more likely to read foreign news sources, Der Spiegel's article hinders her ability to negotiate contracts for foreign-language editions of both her current book and future projects. Id. ¶ 85.

**B.**

The defendants argue that there is no personal jurisdiction over the defendants in New York.

The defendants are organized under German law with a principal place of business in Hamburg, Germany. Id. ¶ 19. DER SPIEGEL Gmbh & Co. KG has primary responsibility for the magazine's online edition and SPIEGEL-Verlag Rudolf Augstein

Gmbh & Co. KG has primary responsibility for the magazine's print edition. Id. To market and manage subscriptions of Der Spiegel within the United States, the defendants contract with IPS Pressevertrieb ("IPS"), a third-party German service provider that partners with Data Media, Inc. ("Data Media"), a company located in Buffalo, New York. Sieb Decl. ¶¶ 8-9. The United States Postal Service requires the maintenance of a "Known Office of Publication" to authorize mailing privileges for periodicals. Id. ¶ 10. Data Media operates as the "Known Office of Publication" for Der Spiegel. Id. ¶ 11. Der Spiegel has neither a direct contract nor a contractual relationship with Data Media regarding Data Media's role as Der Spiegel's "Known Office of Publication." Id.

There are six newsstands that sell Der Spiegel in New York. Id. ¶ 16. In 2022, these newsstands sold seventeen copies of the magazine issue containing the allegedly defamatory article. Id. ¶¶ 13-16. Additionally, Der Spiegel identified seventy subscribers to the print edition who were located in New York at the relevant time. Id. ¶ 13.

Der Spiegel articles are also accessible online via a paid subscription to the interactive website, SPIEGEL+. Am. Compl. ¶ 29. The online version of the allegedly defamatory article was available behind a paywall on Der Spiegel's website, and only accessible to subscribers who had purchased a SPIEGEL+ online

subscription. Id. ¶ 30. Readers who subscribe to SPIEGEL+ are invited to select the country from which they will be using the online subscription, including the United States. See id. ¶ 29. After selecting the United States, subscribers can then enter payment details to access SPIEGEL+. Id. The defendants assert that they do not have "reliable information regarding the location of the digital subscribers or the subscribers to SPIEGEL+." Sieb Decl. ¶ 13. As of October 16, 2023, there were only 112 page views of and sixty-eight page visits to the allegedly defamatory article from New York. See id. ¶ 20.

Der Spiegel also has an office located at 516 5th Avenue New York, New York. See Am. Compl. ¶ 27. The defendants claim that the defendants decided to close the New York office in November 2020 but have not yet terminated the lease. Sieb Decl. ¶ 24. The last office assistant left the New York office in June 2021. Id.

**II.**

On February 2, 2024, the defendants moved to dismiss the plaintiff's amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) and, in the alternative, based on forum non conveniens. Defs.' Mot. to Dismiss, ECF No. 21. On March 1, 2024, the plaintiff moved to transfer the case to a federal court in the District of Arizona or the Central District

of California as an alternative to the defendants' motion to dismiss. Mot. to Transfer Case in the Alt.

**A.**

On a motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." Mende v. Milestone Tech., Inc., 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) (quoting Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999)).[3] To survive a motion to dismiss where no evidentiary hearing is held, the plaintiff need only make a prima facie case that the defendant is subject to the Court's personal jurisdiction. See In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction.").

"In determining whether a plaintiff has met this burden, [the Court] will not draw argumentative inferences in the plaintiff's favor" but will "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994); see also Mende, 269 F. Supp. 2d at 251. Nevertheless, "although pleadings and affidavits are construed

_____

[3] Unless otherwise noted, this Opinion & Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

in the light most favorable to the plaintiff, 'conclusory non-fact-specific jurisdictional allegations or a legal conclusion couched as a factual allegation will not establish a prima facie showing of jurisdiction.'" DeLorenzo v. Ricketts & Assocs., Ltd., No. 15-CV-2506, 2017 WL 4277177, at *5 (S.D.N.Y. Sept. 25, 2017) (quoting Bracken v. MH Pillars Inc., No. 15-CV-7302, 2016 WL 7496735, at *2 (S.D.N.Y. Dec. 29, 2016)).

To determine whether jurisdiction exists over a non-domiciliary, the Court must determine whether New York law allows the exercise of personal jurisdiction and, if so, whether doing so comports with constitutional due process guarantees. See Edwardo v. Roman Catholic Bishop of Providence, 66 F.4th 69, 73 (2d. Cir. 2023); Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d. Cir. 2013). If New York law does not permit the Court to exercise personal jurisdiction over the non-domiciliary defendants, then the Court need not determine whether jurisdiction would be permissible under the United States Constitution. See Licci, 673 F.3d at 60-61; Penguin Grp. (USA) Inc. v. Buddha, 609 F.3d 30, 35 (2d Cir. 2010).

**B.**

The plaintiff claims that this Court has long-arm jurisdiction over the defendants under New York Civil Practice Law & Rules ("CPLR") §§ 302(a)(1) and 302(a)(4). Am. Compl. ¶

21. The plaintiff also claims that exercising jurisdiction would be consistent with constitutional due process. See Plaintiff's Opposition ("Pltf's Opp."), ECF No. 28 at 14.

We begin our personal jurisdiction analysis with the 2007 decision by the Second Circuit Court of Appeals in Best Van Lines, Inc. v. Walker, 490 F.3d 239 (2d Cir. 2007). In Best Van Lines, the court addressed the scope of CPLR § 302(a) in the context of a defamation lawsuit. See id. In that case, the plaintiff—a New York-based moving company—asserted that the defendant—an Iowa-based proprietor of a not-for-profit internet website—had posted defamatory statements about the moving company on the defendant's website. See id. at 240. The question in Best Van Lines was whether the United States District Court for the Southern District of New York had personal jurisdiction pursuant to CPLR § 302(a)(1) over the defendant for the purposes of the plaintiff's defamation lawsuit.

In Best Van Lines, the Court of Appeals for the Second Circuit held that the defendant's defamatory statements—that were made "outside of New York about New York residents"—did not "without more, provide a basis for jurisdiction, even when those statements [were] published in media accessible to New York readers." Id. at 253. In reaching this conclusion, the court analyzed the relationship between New York's long-arm statute and the constitutional limits on personal jurisdiction, see id.

10

at 242; and the reach of New York's long-arm statute, see id. at
243-44. The court then summarized the test developed by New York
courts to determine in what circumstances personal jurisdiction
over an out-of-state defendant is proper. See id. at 246-52.

First, the court focused on the text of New York's long-arm
statute, CPLR § 302(a), which provides for specific jurisdiction
that may arise from a foreign defendant's contacts with the
state in connection with the cause of action. See CPLR § 302(a).
In contrast to states that permit courts to exercise personal
jurisdiction to the full extent allowed by the federal
Constitution, the court clarified that the "reach of New York's
long-arm statute . . . does not coincide with the limits of the
Due Process Clause." Best Van Lines, 490 F.3d at 244.

Sections 302(a)(2) and (3) of the CPLR permit jurisdiction
over tortious acts committed in New York and those committed
outside of New York that cause injuries in the state. See CPLR
§§ 302(a)(2),(3). Both subsections explicitly exempt causes of
action for the tort of defamation, thereby creating a "gap"
between the jurisdiction conferred by the statute and the
jurisdiction permissible under the United States Constitution.
See Best Van Lines, 490 F.3d at 245.

Even though CPLR §§ 302(a)(2) and (3) exclude defamation, a
plaintiff can still acquire jurisdiction under section
302(a)(1). Id. at 245-46 (citing Legros v. Irving, 327 N.Y.S.2d

371, 373 (1st Dep't 1971)). "[C]onsistent with the cardinal rule
of statutory construction that a statute is to be read as a
whole," the court explained that CPLR § 302(a)(1) "factors into
the analysis the defamation exemptions contained in sections
302(a)(2) and (3)." Id. at 248 n.11. Accordingly, "[s]ome
distance remains between the jurisdiction permitted by the Due
Process Clause and that granted by New York's long-arm statute."
Id. at 248.

Focusing on CPLR § 302(a)(1), the Second Circuit Court of
Appeals explained that this subsection authorizes a court to
exercise personal jurisdiction over any non-domiciliary
defendant where the defendant "transacts any business within the
state or contracts anywhere to supply goods or services in the
state." See id. at 244 (quoting CPLR § 302(a)(1)). Accordingly,
under New York law, to assert long-arm jurisdiction under CPLR §
302(a)(1), the non-domiciliary defendant must "transact
business" within the state and the claim against the foreign
defendant must "arise out of" the defendant's activities within
New York. Id., 490 F.3d at 246.

In a defamation action such as this, Best Van Lines teaches
that "New York courts construe 'transacts any business within
the state' more narrowly in defamation cases than they do in the
context of other sorts of litigation." 490 F.3d at 248. Indeed,
"when the defamatory publication itself constitutes the alleged

12

transaction of business for the purposes of section 302(a)(1),
more than the distribution of a libelous statement must be made
within the state to establish long-arm jurisdiction over the
person distributing it." Id.

Applying these principles to the specific allegations in
Best Van Lines, the court considered whether the defendant's
internet postings about the New York moving company were "the
kind of activity by which the defendant purposefully availed
himself of the privilege of conducting activities within the
forum state, thus invoking the benefits and protections of its
laws." Id. at 253.

Addressing the first prong of the test—whether the alleged
conduct could be considered the "transaction of business" under
CPLR § 302(a)(1)—the court distinguished the defendant's conduct
from defamation cases in which New York courts have exercised
personal jurisdiction. Id. at 248-49. The court noted that "New
York courts have found jurisdiction in cases where the
defendants' out-of-state conduct involved defamatory statements
projected into New York and targeting New Yorkers, but only
where the conduct also included something more." Id. at 249
(distinguishing a decision by the N.Y. Supreme Court, Appellate
Division, in which the Fourth Department concluded that one
allegedly defamatory letter sent by the defendants could provide
a basis for jurisdiction where the defendants had "drafted the

13

letter" and demonstrated "active involvement and personal
control [in New York]" over the writing and distribution of the
allegedly defamatory statement(quoting Sovik v. Healing Network,
665 N.Y.S.2d 997, 999 (4th Dep't 1997))). The court then
reasoned that mere distribution, by contrast, does not amount to
a transaction of business within the state under Section
302(a)(1). See id. (collecting decisions by New York courts in
which the act of sending allegedly defamatory letters, or the
distribution of an allegedly libelous broadcast, did not
establish personal jurisdiction).

   The Best Van Lines court therefore concluded that the
defendant's "allegedly defamatory statements posted on a website
accessible to readers in New York" did not, "without more,
provide[] a basis for jurisdiction, even when those statements
[were] published in media accessible to New York readers." Id.
at 253. Furthermore, because "the nature of [the defendant's]
comments d[id] not suggest that they were purposefully directed
to New Yorkers rather than a nationwide audience," the court
reasoned that the defendant did not "purposefully avail[]
himself of the privilege of conducting activities within New
York." Id. The court therefore held that the plaintiff had
failed to make out a prima facie case of personal jurisdiction
under New York law because the defendant's website postings did

not constitute "transacting business under section 302(a)(1)."
Id. at 254.

Finally, having found that personal jurisdiction could not
be exercised under New York's long-arm statute, the court
declined to analyze whether personal jurisdiction was proper
under the Due Process Clause of the Fourteenth Amendment. Id. at
255.

**i.**

Based on Best Van Lines and its progeny, there is no
specific personal jurisdiction under CPLR § 302(a)(1) based on
the allegedly defamatory article in this case.

**a.**

With respect to the written article, only seventeen copies
of the issue were sold at newsstands in New York, compared to
128,857 total copies sold worldwide. Sieb Decl. ¶ 16. There is
no allegation that Data Media—the third-party company in Buffalo
that was responsible for distributing the article—was involved,
in any way, with writing or editing the article. Indeed, there
are no allegations that any activities in connection with
writing or editing the article occurred in New York.

The publication of a written article that is simply
circulated in New York is insufficient to establish that the
defendants "transacted business" that was "purposefully

15

directed" at New York. See Satanic Temple, Inc. v. Newsweek Mag.
LLC, 661 F. Supp. 3d 159, 167 (S.D.N.Y. 2023). The "mere fact
that the allegedly defamatory postings may be viewed in New York
. . . is insufficient to sustain a finding of jurisdiction."
Knight-McConnell v. Cummins, No. 03 Civ. 5035, 2005 WL 1398590,
at *3 (S.D.N.Y. Jun. 13, 2005) (quoting Best Van Lines, Inc. v.
Walker, No. 03 Civ. 6585, 2004 WL 964009, at *5 (S.D.N.Y. May 5,
2004)).

    As Best Van Lines teaches, New York courts may exercise
personal jurisdiction when the defendant, through out-of-state
conduct, projects defamatory statements into New York, "but only
where the conduct also include[s] something more." Goldfarb v.
Channel One Russia, 442 F. Supp. 3d 649, 662 (S.D.N.Y. 2020)
(quoting Best Van Lines, 490 F.3d at 249). "The 'something more'
standard is satisfied when at least part of the defamatory
content was created, researched, written, developed, or produced
in New York." Prince v. Intercept, 634 F. Supp. 3d 114, 129
(S.D.N.Y. 2022); see also 79th Grp., Inc. v. Moore, No. 1:23-cv-
2521, 2024 WL 36992, at *7 (S.D.N.Y. Jan. 3, 2024) (quoting Best
Van Lines, 490 F.3d at 249).

    This conclusion is also consistent with the analysis in
Tannerite Sports, LLC v. NBCUniversal Media, LLC. See 135 F.
Supp. 3d 219, 234 (S.D.N.Y. 2015), aff'd sub nom. Tannerite
Sports, LLC v. NBCUniversal News Grp., 864 F.3d 23 (2d Cir.

2017). In that case, the district court declined to exercise personal jurisdiction under CPLR § 302(a)(1) over a television station and news company when that company did not intentionally broadcast a story for New York viewers, and when an internet article posted by the company was read by thirteen users in New York. See id. In Tannerite, as in this case, the plaintiff failed to demonstrate that the mere availability of the defamatory statements in New York was sufficient to satisfy the "transacts any business" prong of CPLR § 302(a)(1), or that defendants purposefully directed their alleged defamatory statements at New York. See id. at 230-31, 234.

Donner attempts to distinguish Tannerite by alleging that the Der Spiegel defendants purposefully transacted business in New York because they used Data Media to distribute the magazine throughout the United States. See Pltf's Opp. at 9. Donner asserts that because the defendants contract with the German company, IPS—which in turn partners with Data Media to market and manage Der Spiegel's subscriptions in the United States—the defendants engaged in the purposeful transaction of business in New York. Am. Compl. ¶ 25; Pltf's Opp. at 3-4, 8-9.

The plaintiff's argument is without merit. Data Media's distribution of allegedly defamatory material is, without more, insufficient to establish that the defendants purposefully transacted business under New York's long-arm statute. See,

e.g., Best Van Lines, 490 F.3d at 249 (citing Kim v. Dvorak, 658 N.Y.S.2d 502 (3d Dep't 1997); Streslin v. Barrett, 320 N.Y.S.2d 885 (1st Dep't 1971)). The distribution of the article is the substance of the defamation and CPLR § 302, with its defamation exceptions in §§ 302(a)(2) and (3), is drafted to preclude personal jurisdiction over the mere distribution of defamatory material in New York. Instead, there must be some connection to the actual writing or editing of the article which underlies the cause of action, not simply an allegation that the article was distributed. See, e.g., Morsy v. Pal-Tech, Inc., No. 07 Civ. 2143, 2008 WL 3200165, at *4-5 (S.D.N.Y. Aug. 7, 2008).

Moreover, Donner has failed to show that the alleged defamation otherwise "arises from" the defendants' business transactions in New York. While the defendants acknowledge that they have an empty office in New York that has been empty since June 2021, see Sieb Decl. ¶ 24, there is no allegation that the alleged defamation "arises from" the activities of that space. Indeed, the defendants' primary news bureau in the United States is in Washington, D.C., not New York. Id. ¶ 23. Moreover, Donner has not alleged that any employees in Manhattan—or in Buffalo— were involved in the creation of the article. The alleged facts show mere distribution, and the mere distribution of alleged defamation is insufficient to establish that personal

jurisdiction is proper in this case. <u>See</u> <u>Best Van Lines</u>, 490 F.3d at 253-55; <u>Tannerite Sports</u>, 135 F. Supp. 3d at 234.

### b.

With regard to the online publication of the article, the plaintiff claims that the defendants' use of an interactive website to sell their online SPIEGEL+ service constitutes a purposeful transaction of business in New York. <u>See</u> Am. Compl. ¶ 29; Pltf's Opp. at 11-12. The plaintiff alleges that the SPIEGEL+ website is interactive because it requests that online subscribers first disclose the country from which they will be using the online subscription, Am. Compl. ¶ 29, and because the subscriber is then invited to enter payment details in order to gain access to the subscription, <u>id.</u> ¶¶ 29-30.

The plaintiff's argument is unpersuasive. As discussed above, "the posting of defamatory material on a website accessible in New York does not, without more, constitute 'transacting business' in New York for the purposes of New York's long-arm statute." <u>Best Van Lines</u>, 490 F.3d at 250; <u>Realuyo v. Villa Abrille</u>, No. 01 Civ. 10158, 2003 WL 21537754, at *6-7 (S.D.N.Y. July 8, 2003). Moreover, the Second Circuit Court of Appeals has cautioned that a website's interactivity may be useful for analyzing personal jurisdiction under CPLR § 302(a)(1), "but only insofar as it helps to decide whether the defendant . . . purposefully availed himself of the privilege of

conducting activities within New York, thus invoking the
benefits and protections of its laws." Best Van Lines, 490 F.3d
at 252. "[T]raditional statutory and constitutional principles
remain the touchstone of the inquiry." Id.

In Best Van Lines, the Court of Appeals found that the
operation of an interactive web site that was accessible in New
York and that solicited contributions was insufficient to
satisfy the requirement of § 302(a)(1). Id. at 251-52. Operating
such a website did not mean that the defendant "transact[ed]
business" in New York for purposes of a defamation claim arising
from content posted on that interactive web site. Id.

In this case, there is no showing that the Der Spiegel
defendants "purposefully availed" themselves of business
transactions in New York through the online publication of the
article. As of October 16, 2023, there were only 112 page views
and sixty-eight page visits of the online article from within
New York. See Sieb Decl. ¶ 20. And, apart from identifying the
"United States" as the country from which they will be using
their subscription, online subscribers need not specify that
they live in New York before accessing SPIEGEL+. See Am. Compl.
¶ 29. Nor is there any evidence that the defendants derived a
significant part of their revenue from digital subscriptions in

New York.[4] Online activities such as these provide no basis for jurisdiction. See Knight-McConnell, 2005 WL 1398590, at *3 (declining to exercise jurisdiction over a defendant who intended for an online message to be read by "the entire worldwide internet audience," that was not "directed at any specific forum").

The defendants are therefore correct that simply publishing an article containing allegedly "defamatory utterances" that is circulated on the internet in New York is not sufficient on its own to qualify as "transacting business" under CPLR § 302(a)(1). See Best Van Lines, 490 F.3d at 248-49; see also Trachtenberg v. Failedmessiah.com, 43 F. Supp. 3d 198, 204-05 (E.D.N.Y. 2014) (concluding that a "merely coincidental" relationship between an online article accessed in New York and the cause of action "does not suffice to confer jurisdiction" and collecting cases); SPCA of Upstate N.Y., Inc. v. Am. Working Collie Ass'n, 963 N.E.2d 1226, 1229 (N.Y. 2012) (finding that allegedly defamatory statements published by an out-of-state defendant on a website that were "equally accessible" in New York as in "any other

---

[4] The defendants assert that they lack reliable information regarding the location of the digital subscribers or the subscribers to the SPIEGEL+ platform. See Sieb Decl. ¶ 13. But, as of October 16, 2023, there were only 112 page views and sixty-eight page visits of the article from New York. Id. ¶ 20. This represents a miniscule percentage of Der Spiegel's total global presence: The website attracts approximately 35 million users per month, generating 530 million page views and 190 million site visits. See id. ¶¶ 20-21.

jurisdiction," and that were not "written in or directed to New York," were insufficient to establish personal jurisdiction). Moreover, the mere act of making an online article available for SPEIGEL+ subscribers to read is insufficient for personal jurisdiction. <u>Best Van Lines</u>, 490 F.3d at 253.[5] The plaintiff has therefore failed to make a threshold showing of jurisdiction under Section 302(a)(1).

### ii.

The plaintiff also asserts that personal jurisdiction can be based on CPLR § 302(a)(4), which authorizes personal jurisdiction over a non-domiciliary in New York who "owns, uses, or possesses any real property situated within the state." The cause of action must arise from those activities and there is no exception for torts based on defamation. The plaintiff in this case argues that jurisdiction is proper under § 302(a)(4) because the defendants used their "agent," Data Media, to distribute copies of the magazine containing the article through their "Known Office of Publication" in Buffalo, New York. <u>See</u> Am. Compl. ¶ 21; Pltf's Opp. at 13.

---

[5] This case is unlike the other cases where the interactive website allowed more interactive conduct in New York. <u>See</u>, <u>e.g.</u>, <u>Capitol Recs., Inc., v. MP3tunes, LLC</u>, No. 07 Civ. 9931, 2008 WL 4450259, at *4 (S.D.N.Y. Sept. 29, 2008)(finding that an online music distributor engaged in business transactions sufficient to sustain the court's exercise of personal jurisdiction because the website—which permitted users to download music, send messages, and store music files—did "more than just make information available to users.").

However, the defendants in this case do not own real property in Buffalo; rather, Data Media—a separate company—operates a "Known Office of Publication" in Buffalo, which allows Data Media to manage a small number of Der Spiegel subscriptions. See Sieb Decl. ¶ 11.

Moreover, to assert personal jurisdiction under § 302(a)(4), "it is not enough for the property to be related in some way to the parties' dispute; the plaintiff's cause of action must arise out of the fact of ownership, use or possession of New York realty." Elsevier, Inc. v. Grossman, 77 F. Supp. 3d 331, 346 (S.D.N.Y. 2015). In this case, the plaintiff's defamation claim arises out of the publication of an allegedly defamatory article, not the use or ownership of an office building or "Known Office of Publication." The plaintiff points to no comparable case where the use of a distribution site for an allegedly defamatory publication was sufficient for jurisdiction under CPLR § 302(a)(4). To find personal jurisdiction under CPLR § 302(a)(4) for the mere use of property to distribute an allegedly defamatory publication would be inconsistent with the exception for defamation torts under CPLR § 302(a)(2) and the analysis in Best Van Lines. Therefore, the plaintiff's § 302(a)(4) argument is without merit.

**iii.**

The defendants also assert that this Court cannot exercise personal jurisdiction over the defendants consistent with constitutional due process. But, because the plaintiff has failed to demonstrate any statutory basis for personal jurisdiction over the defendants, the Court need not determine whether exercising personal jurisdiction would violate constitutional due process. Best Van Lines, 490 F.3d at 242 (stating that courts need to consider constitutional due process "[i]f, but only if" personal jurisdiction is statutorily permissible).

**iv.**

Finally, because the plaintiff has failed to make out a prima facie case for personal jurisdiction, the plaintiff is not entitled to jurisdictional discovery. See Best Van Lines, 490 F.3d at 255 (finding that the district court did not err in denying jurisdictional discovery where the plaintiff failed to make out a prima facie case for jurisdiction); 79th Grp., 2024 WL 36992, at *14; Tannerite Sports, 135 F. Supp. 3d at 231.

**C.**

The defendants also move to dismiss the action for improper venue pursuant to Rule 12(b)(3). See Fed. R. Civ. P. 12(b)(3). The plaintiff bears the burden of showing that venue is proper once an objection is raised. PI, Inc. v. Quality Products, Inc.,

24

907 F. Supp. 752, 757 (S.D.N.Y. 1995). However, because there is
no personal jurisdiction over the defendants in the Southern
District of New York, this Court need not reach the defendants'
motion to dismiss on the alternative ground of improper venue.
See Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd., 694 F.
Supp. 3d 374, 385 (S.D.N.Y. 2023) (declining to reach a motion
to dismiss for improper venue where the court had already found
that personal jurisdiction was lacking).[6]

### D.

The plaintiff has filed a cross motion to transfer this
action to the District of Arizona (where Loerchner, the Der
Spiegel reporter, worked) or the Central District of California
(where some of Donner's activities authoring the article
allegedly occurred). See Mot. to Transfer Case in the Alt. The
plaintiff has filed this cross motion pursuant to 28 U.S.C. §
1404(a) and/or 28 U.S.C. § 1406(a). Id.

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of
parties and witnesses, in the interest of justice, a district
court may transfer any civil action to any other district . . .
where it might have been brought." 28 U.S.C. § 1404(a); see
Posven, C.A. v. Liberty Mut. Ins. Co., 303 F. Supp. 2d 391, 399-

_____

[6] It is also unnecessary to reach the defendants' alternative argument
that this action should be dismissed based on the doctrine of forum
non conveniens.

25

409 (S.D.N.Y. 2004). And, pursuant to 28 U.S.C. § 1406(a), the district court "in which is filed a case laying venue in the wrong . . . district" has discretion to dismiss or, "if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 257 F. Supp. 2d 648, 649 (S.D.N.Y. 2003).[7]

"The relevant inquiry under either § 1404(a) or § 1406(a) is whether the 'interests of justice' militate in favor of transfer or dismissal." Pares v. Gordon, No. 91 Civ. 1344, 1992 WL 296437, at *2 (S.D.N.Y. Oct. 8, 1992). "This decision is within the court's discretion." Id. (citing Spar, Inc. v. Info. Res., Inc., 956 F.2d 392, 394 (2d Cir. 1992)).

In this case, the Court declines to exercise its discretion to transfer venue to the District of Arizona or to the Central District of California. This is not a case in which the statute of limitations would bar the plaintiff from filing the

---

[7] As a threshold matter, even though this Court lacks personal jurisdiction over these defendants, "[t]he language of § 1406(a) is amply broad enough to authorize the transfer of cases . . . whether the court in which it was filed had personal jurisdiction over the defendants or not." Corke v. Sameiet M.S., 572 F.2d 77, 79 (2d Cir. 1978)(quoting Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466 (1962)). And § 1406 can be used if venue is "wrong" in a district court because personal jurisdiction is lacking. Id. at 79-80. But, "the receiving court must be a proper venue and must possess personal jurisdiction over the defendants." Wohlback v. Ziady, No. 17 Civ. 5790, 2018 WL 3611928, at *3 (S.D.N.Y. Jul. 27, 2018).

plaintiff's claims in a proper forum. See, e.g., Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 435 (2d Cir. 2005) ("A 'compelling reason' for transfer is generally acknowledged when a plaintiff's case, if dismissed, would be time-barred on refiling in the proper forum.").

With respect to the statute of limitations in Arizona and in California, the plaintiff argues that there is a "potential dispute over statute of limitations issues," see Pltf's Supp. Memo., ECF No. 45 at 9, but there is no showing that the case would be barred on timeliness grounds in Arizona, and the plaintiff contends that her lawsuit against the defendants would not be barred in California based on equitable tolling. See id. at 9-10.[8] On the other hand, the defendants would contest personal jurisdiction in either Arizona or California, and even if the Court determined that personal jurisdiction was proper in either Arizona or California, that decision is far from clear.

_____

[8] The plaintiff filed this action on September 15, 2023. See ECF No. 1. Both Arizona and California have one-year statutes of limitations for claims of libel and slander. See Ariz. Rev. Stat. § 12-541(1); Cal. Civ. Proc. Code § 340(c). Arizona has a savings statute that would allow Donner six months to file a new action after termination of this action. See Ariz. Rev. Stat. § 12-504. By contrast, California's savings statute applies when a judgment has been reversed, see Cal. Civ. Proc. Code § 355, but equitable tolling permits the judge to take account of several factors, including: "(1) timely notice to the defendant in the filing of the first claim; (2) lack of prejudice to the defendant in gathering evidence to defend against the second claim; and (3) good faith and reasonable conduct by the plaintiff in filing the second claim." Hatfield v. Halifax PLC, 564 F.3d 1177, 1185 (9th Cir. 2009).

An incorrect decision could transfer this litigation to an improper forum and risk the ability of the plaintiff to file the lawsuit on a timely basis in a proper forum.[9]

Moreover, the plaintiff can indisputably file this case in Germany, which has far greater contacts with the parties and issues than any forum suggested by the plaintiff. Neither party disputes that Germany would be a proper forum. See Pltf's Opp. at 25; Defs.' Memo. in Support, ECF No. 22 at 25-26. At the hearing on the defendants' motion to dismiss, the defendants asserted that "[t]here's no dispute that Germany is an adequate alternative forum. There's no dispute that the vast majority of the events related to the article, including plaintiff's interview, occurred in Germany, and that most of the witnesses are in Germany, including the German resistance expert who provided most of the challenged statements at issue in this

---

[9] The cases that the plaintiff relies on do not support transfer in this case. See Pltf's Supp. Memo. at 7-9. Rather, these are cases in which the defendants either consented to jurisdiction, see Alpi USA, Inc. v. D & F Fashion Int'l Gemelli, No. 06 Civ. 2091, 2007 WL 942096, at *4 (S.D.N.Y. Mar. 29, 2007), or in which personal jurisdiction over the defendants in the transferee forum was clear, see Birittieri v. Whole Foods Mkt. Grp., Inc., No. 21-cv-8703, 2023 WL 2266481, at *6 (S.D.N.Y. Feb. 28, 2023); Paroni v. Gen. Elec. UK Holdings Ltd., No. 19 Civ. 1034, 2021 WL 5154111, at *2 (S.D.N.Y. Nov. 5, 2021). This is not such a case. Instead, transferring the action would "undermine the goals of the transfer statutes." See In re Ski Train Fire, 257 F. Supp. 2d at 651 (dismissing the case, rather than transferring the venue, because the decision to transfer the action to a jurisdiction which may ultimately be found to lack personal jurisdiction "would be grossly inefficient and would undermine the goals of the transfer statutes, which are to permit transfer only to a district in which the action could have been brought.").

case, who would not be subject to regular subpoena power here."
Hearing Tr., ECF No. 43 at 15. Furthermore, there is a three-
year statute of limitations in Germany, and there is no
procedural bar to bringing the suit in Germany. Id. at 15–16.
The plaintiff agreed that the case "could have been brought and
could be brought in Germany." Id. at 29.

There is therefore no showing that this is a case where
dismissal, rather than transfer, would cause the plaintiff to
suffer the loss of her claims. See Goldlawr, 369 U.S. at 466. It
is not in the interest of justice to transfer this case to the
District of Arizona or the Central District of California. See
Satanic Temple, 661 F. Supp. 3d at 168 (declining to transfer
venue after concluding that the district court lacked
jurisdiction over the defendants in a defamation case).

## CONCLUSION

The Court has considered all of the arguments of the parties in this case. To the extent that they are not discussed above, those arguments are either moot or without merit. For the reasons stated above, the defendants' motion to dismiss for lack of personal jurisdiction is granted. The plaintiff's motion to transfer venue is denied.

The Clerk is directed to close all pending motions and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          September 4, 2024

_____
John G. Koeltl
United States District Judge

**[SPA-31]**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
REBECCA DONNER,

                     Plaintiff,

        -against-                          23 **CIVIL** 8196 (JGK)

                                                  **JUDGMENT**

DER SPIEGEL GMBH & CO. KG, ET AL.,

                     Defendants.
-----------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated September 4, 2024, the Court has considered all of

the arguments of the parties in this case. To the extent that they are not discussed, those

arguments are either moot or without merit. The defendants' motion to dismiss for lack of

personal jurisdiction is granted. The plaintiff's motion to transfer venue is denied; accordingly,

the case is closed.

**Dated:**  New York, New York

        September 5, 2024


                                      **DANIEL ORTIZ**
                                  **Acting Clerk of Court**

                **BY:**        K. mango

                                      **Deputy Clerk**